Filed 9/1/15  P. v. Eberhart CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MAJOR EBERHART,<br><br>    Defendant and Appellant. | A132736<br><br>(Contra Costa County<br>  Super. Ct. No. 50713693) |
| In re MAJOR EBERHART,<br><br>    on Habeas Corpus. | A139535 |

Defendant Major Eberhart was sentenced to serve 91-years-to-life in state prison after a jury convicted him of first degree murder and other offenses related to a jewelry store robbery that was followed by an incident in which Eberhart shot another one of the robbers as they were dividing up the robbery proceeds.  On appeal, Eberhart contends the evidence was insufficient to support his conviction for first degree murder, and he claims that a felony-murder theory presented to the jury as an alternative to a premeditation theory was legally invalid.  Eberhart further argues that a photo lineup shown to the jewelry store owner was impermissibly suggestive and that the owner's testimony identifying him should have been excluded.  In both his direct appeal and in a habeas corpus petition, Eberhart contends that testimony offered by a gang expert to support criminal street gang enhancements was based upon testimonial hearsay and violated his

1

Sixth Amendment right to confront witnesses against him. Finally, Eberhart asserts that prior convictions used to enhance his sentence were neither admitted nor proved at trial.

The People concede that the prior conviction enhancements were not proved at trial and must be reversed. On remand, the prior conviction allegations may be retried. We also direct the trial court to correct the abstract of judgment to properly reflect the criminal street gang enhancements imposed by the court. We otherwise reject Eberhart's contentions and affirm the judgment of conviction as modified.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Factual Overview*

In April 2007, Eberhart and two other men robbed a jewelry store in Daly City. The robbers were members of the KUMI gang. They fled to Richmond, where they broke into a vacant apartment to divide up the proceeds of the robbery. Eberhart shot and killed another one of the robbers, Randy Weathers, after he learned that Weathers was attempting to conceal some of the loot for himself. Aside from forensic evidence and expert testimony related to gang-related allegations, the evidence at trial largely consisted of the testimony of three individuals: (1) Joanna Peppars, who was married to Weathers and knew of Eberhart's involvement in the robbery scheme; (2) Norflis McCullough, a KUMI gang member who was informed by Eberhart of the circumstances in which Weathers was killed; and (3) Iana Pennisi, the owner of the jewelry store in Daly City that was robbed. The relevant evidence presented at trial is summarized below.

### *The Victim's Wife*

Joanna Peppars was the wife of Randy Weathers, whose body was found in Richmond on April 22, 2007. Peppars, who was also known as Peaches, lived with Weathers in San Francisco. For most of their eight-year relationship, Weathers had been incarcerated. According to Peppars, Weathers was a member of KUMI, a prison-based gang. While Weathers was incarcerated, Peppars arranged calls between him and others on the outside. When he was out of custody, he often performed assignments for KUMI. Weathers took orders from Eberhart, whom Peppars described as a "general" in KUMI. Eberhart was also known by the moniker, "Mac Maj." Over time, Weathers had

2

introduced Peppars to several of his KUMI associates, including Norflis "Pooh" McCullough.

Weathers had been released from jail about one month before his death. He told Peppars about a plan to rob a jewelry store in Daly City. At first, Troy "Vimp" Bridges and Chris Magudatto were supposed to be involved in the robbery. The robbery was planned for a Saturday, when the male owner of the store would not be there.

About two weeks before the planned robbery, Eberhart became involved because Magudatto could not participate. At one point, Weathers and Peppars were riding in a car with Bridges and Eberhart. The men discussed the planned robbery in code. Peppars also overheard Weathers speaking on the phone with Eberhart about the robbery.[1] Peppars later learned that Bridges dropped out of the robbery as well. Evidence presented at trial established that Magudatto and Bridges had been arrested in early to mid-April 2007 for their involvement in an unrelated stabbing incident.

On the morning of Saturday, April 21, 2007, Weathers told Peppars that the robbery was taking place that day. His role was to get the woman who ran the jewelry store to let them in. He told Peppars that he was participating in the robbery for money and because he feared Eberhart. Weathers was picked up that morning at the corner of Golden Gate and Jones in San Francisco. Eberhart was in the passenger seat. Peppars did not recognize the driver of the vehicle. She was only a few feet from Eberhart and asked him when he would bring Weathers back. Peppars testified that Eberhart had braids along his head that ended by his shoulders with what she described as "small twisties."

Peppars last saw Weathers at 10:30 a.m. on Saturday, April 21, when he drove off with Eberhart. Weathers anticipated the robbery would be over by 1:00 p.m. and told

---

[1] As Eberhart points out, Peppars purportedly told the police a story slightly different from the one she testified to at trial. She told the police she was not aware of Eberhart's involvement in the robbery until the Wednesday before the Saturday on which the robbery occurred. She also told the police that the only time she saw Eberhart in a car was when he picked up Weathers on the day of the robbery.

Peppars he would call her afterward at her sister's house. Peppars started to worry when she had not heard from him during the afternoon. She called her sister throughout the afternoon to see if Weathers had called. Peppars learned that Weathers's longtime friend, Norfliss McCullough, called her sister's house at around 6:00 p.m. to say that he had not heard from Weathers. She tried to reach McCullough but there was no answer. She called again the following morning at around 10:00 a.m. and spoke with McCullough, who told her that Weathers had instructed him to call her back the previous evening but that he got tied up. McCullough told her that things had not gone as planned. He also told her that he did not know where Weathers was, did not know what was going on, and that everyone had to lie low.

At around 11:00 a.m. on the day following the robbery, detectives arrived to tell Peppars that her husband was dead. She told the detectives about her husband's involvement in a plan to rob a jewelry store in Daly City the day before. She said that Eberhart was the front passenger in the vehicle that picked up Weathers the morning of the robbery, and she identified a photo of Eberhart. Peppars also told the officers about her earlier phone conversation with McCullough. The police gave her equipment to record future calls.

In the early afternoon of April 25, Peppars reported to a police officer that she was very upset by a call she received from Eberhart. She was scared and distraught. She said she had received a three-way call from Eberhart through McCullough asking that she meet Eberhart on Market Street in San Francisco and bring some clothing and other items for Weathers. Peppars pretended to be looking for Weathers even though she knew he was dead. Eberhart and McCullough were apparently unaware that Peppars knew Weathers was dead. Eberhart, who identified himself as "Lil' Dude, M.M.," told her that things "really got nasty" and that Weathers had left his jacket at the robbery scene and was afraid to even speak with her on the phone. He cautioned her about talking with anyone. Peppars believed Eberhart was going to harm her due to her knowledge of who had been involved in the robbery. Peppars had further conversations with McCullough,

4

who instructed her to meet Eberhart on Market Street. She did not meet with Eberhart as instructed and was instead placed into witness protection.

### The Jewelry Store Owner

Iana Pennisi owned West Coast Jewelry and Coins in Daly City as of April 2007. At around 1:00 p.m. on April 21, a man rang the bell to the store and showed her a ring through the window. She recognized the ring as a repair job and buzzed him in. He told her that he decided to have the ring repaired.

As Pennisi was examining the ring, she heard someone else walk into the store. She looked up and saw two men with bandannas over the lower part of their faces. The first man (suspect number one) who entered with the ring pulled a gun and told her not to move. She pressed the alarm. Suspect number one jumped over the counter and emptied jewelry trays. The other two men, suspect numbers two and three, went back to the safe. She hit the alarm again. Pennisi saw very little of suspect number two. She saw suspect number three more clearly. He was carrying a plastic bag containing customer orders. She asked him to leave them. He stopped, looked at her for a few seconds, and then left and closed the door. Suspect numbers one and two had already left. Pennisi estimated that the robbers got away with close to $40,000 of jewelry and cash.

When the police arrived, she told them that suspect number one had glasses, a hat, and a jacket. One of the suspects was tall, one had braided hair, and one had "really cold, cool eyes." Additional details came back to her over time. Suspect number three's eyes looked familiar to her. Suspect number three was an African-American male, about her height, and stocky. He was wearing a bandanna. His hair was in a braided style going from front to back. He appeared to be in his 20's.

At around 1:00 a.m. on April 23, Daly City police arrived at Pennisi's home accompanied by Richmond police officers. The officers showed Pennisi a photo lineup containing a photo of Eberhart. She was also shown a lineup with a photo of Weathers. She could not identify anyone.

The following week, Richmond police showed Pennisi a second photo lineup containing a picture of Eberhart, and a second photo lineup containing a picture of

5

Weathers. She identified Weathers as suspect number one, the man who had first entered the store on the pretext of having a ring repaired. She thought the photo of Eberhart resembled suspect number three based upon the eyes. In viewing the picture, she covered the lower part of Eberhart's face with her hand and was "pretty sure" that he was suspect number three. Her level of certainty was 50 percent. She thought he might have visited the store alone a month earlier trying to sell gold teeth, but she was not certain.

Several weeks after the robbery, Pennisi identified Troy Bridges in a photograph shown to her by a Richmond police detective. Bridges had originally planned to be a participant in the robbery, according to Peppars. Pennisi described Bridges as a regular customer who several months earlier had asked her if she was afraid of being by herself at the jewelry store.

### The KUMI Gang Member

Richmond police officers arrested Norflis McCullough in May 2007 and conducted a search of his apartment in San Francisco. They seized various guns, which McCullough admitted were illegal. The officers also found an enormous amount of KUMI gang paraphernalia, including several hundred letters, many of which related to the structure, operation, leadership, and business of the gang. They found an image of a warrior overlaying an outline of the African continent.

In the beginning of his interview with the police following his arrest, McCullough was initially evasive and tried to figure out what information the police had that might connect him with the jewelry store robbery and murder of Weathers. After the police interviewer mentioned that the police "already know everything" and had tape recordings of phone conversations involving McCullough in which the robbery and its aftermath were discussed, McCullough chose to divulge more information. He eventually talked about the murder and Eberhart's involvement in it. He also discussed his personal involvement in the KUMI Nation prison gang, Eberhart's current involvement in the gang, and the gang's structure and history.

McCullough was charged with robbery, accessory to murder, and conspiracy to commit the murder of Joanna Peppars. In late 2007, he entered into a plea agreement. In

exchange for his agreement to testify in the case against Eberhart, he pleaded guilty to being an accessory to murder after the fact and was placed on probation.

At trial, McCullough testified concerning the structure of KUMI and his involvement in it. He had been involved in the gang since he was 19 years old. He was concerned about repercussions from testifying about the KUMI organization because it is against KUMI rules to divulge such information.

According to McCullough, KUMI started in prison and has expanded outside the Bay Area. KUMI has a structure of higher and lower divisions and ranks within those divisions. The Executive Body Council (EBC) is the higher division. An EBC commander in good standing can communicate with Leonard Fulgham, who founded KUMI while imprisoned. Fulgham has authority over everyone in KUMI. There can be more than one commander, which is the next step down below Fulgham. The EBC has no ranks below lieutenant and no subdivisions. In 2000, McCullough became an EBC captain, which is a rank below commander. The lower division in KUMI is called the Echelon Golden Chain, or EGC. The ranks are the same as in EBC, the higher division: commander, captain, and lieutenant. Among the items seized by police during the search of McCullough's apartment was a handwritten list of names put together by McCullough of people to whom he spoke or for whom he left messages, including "Vimp" and "White Boy Chris." The names were KUMI gang monikers.

McCullough first met Weathers in early 2006 and knew that he was a KUMI member. Weathers introduced McCullough to his wife, Joanna Peppars, whom McCullough referred to as Peaches. Weathers was a respected foot soldier but did not have a rank in KUMI or authority over other people. In April 2007, Weathers told McCullough he was planning a robbery and explained that he was broke and needed the money.

McCullough had known Eberhart for over 30 years. According to McCullough, Eberhart became a member of KUMI around 2000. Eberhart went by the nicknames Mack Maj, Little Dude, and The Weasel. By 2007, Eberhart was above McCullough in rank and "could have been a commander."

7

On the day before the April 2007 robbery, McCullough placed a three-way call from Fulgham to Eberhart. Fulgham asked McCullough to put "The Weasel" on the line. Fulgham needed money from Eberhart on or before Sunday. Eberhart told Fulgham that he could comply with the request if things went right for him the following day. Fulgham told Eberhart to give the money to "Pooh" McCullough. McCullough denied knowing that Eberhart was planning a robbery.

On the day of the robbery, April 21, 2007, McCullough took the day off from work and tested for a deputy sheriff position in San Francisco. He took the written test in the afternoon. At around 3:00 p.m., Eberhart called and told McCullough that "Randy [Weathers] was gone" and "things didn't go right." They spoke again that afternoon by telephone. During the second phone call, Eberhart told McCullough that they were not able to empty the safe because Weathers had failed to subdue the owner of the jewelry store. Eberhart told McCullough that four men were involved in the robbery—Eberhart, Weathers, and two others.

Eberhart told McCullough that the participants in the robbery arranged to meet at a vacant unit in an apartment complex in Richmond. They went there to divide up what had been taken in the robbery. One of the robbery participants accused Weathers of taking some of the stolen merchandise for himself and withholding it from distribution. The unnamed accuser drew a gun on Weathers and asked Eberhart to check Weathers. Eberhart drew his own gun on the accuser and asked what was going on. Eberhart initially defended Weathers and told the accuser that Weathers "wouldn't do that." Then Eberhart pulled some stolen items from Weathers's pocket. Weathers told Eberhart he was "on that stuff" and had to take care of his wife. He also told Eberhart, "I'll make it up to you." Eberhart responded, "Not in this lifetime," and shot Weathers once in the head. He told McCullough that he did not want to look "soft" to the "dudes out here in the Crescents" and that his "rep" was at stake. Eberhart said that he killed Weathers and that "it had to be done."

8

McCullough was informed that Weathers's body had been moved in a rug or carpet and dumped. McCullough concluded the murder probably occurred in Crescent Park in Richmond because that was where Eberhart hung out.

Eberhart mentioned to McCullough that Peppars had seen Weathers get picked up the day of the robbery. McCullough thought Eberhart was worried that she could be a witness. McCullough called Peppars to arrange for her to meet with Eberhart. He thought she was in danger but made the call at Eberhart's request. Sometime later, there was a three-way call initiated by McCullough involving Peppars and Eberhart in which Eberhart told her where to meet him and to bring clothes.

### The Crime Scene

At 5:25 a.m. on the day after the Daly City jewelry store robbery took place, Richmond police were summoned to a location where a man's body was found lying near the rear of the Crescent Park Apartments. The victim, who was later identified as Randy Weathers, had what looked like a single gunshot wound to his left temple. The cause of death was determined to be a through-and-through gunshot to the head. Gun powder stippling on the skin at the point of entry indicated that the shot had been fired in close proximity to Weathers.

Weathers's clothing was soaked, which indicated that the body had been outside in the rain during the night. There was dried blood on his face and hand. A crime scene investigator's observations led him to believe that Weathers had not been killed at the location where the body was found. Among other things, there was no blood at the scene other than the blood on Weathers's clothing. There were no skull fragments and no brain matter near the body. In addition, there was nothing to suggest Weathers's body had been dragged to that location. Efforts to search the nearby area for casings and projectiles proved fruitless.

Two days after Weathers's body was found, a maintenance worker at the Crescent Park Apartments noticed a broken window and a bedroom full of blood in a vacant, two-story unit. The kitchen window had three sections, the center one of which was broken. One could reach through the broken section, unlock the window, and open the slider.

9

The window was unlocked and the lock on a rear fence gate was broken. It was possible to walk through the rear gate, climb through the kitchen window, and be in the apartment. Although fifteen usable fingerprints were collected from the apartment, none was a match with Eberhart or McCullough.

Bloody shoe impressions made by a Vibram sole were observed on the first floor tiles in the vacant unit. Vibram is a brand name commonly used to describe a waffle sole. Bloody shoe tracks were on the stairs and in the hallway at the top of the stairs. In addition, a blood-soaked sheet that was probably strong enough to carry a man's body was found in a bedroom.

A bullet recovered from the scene was a .357 SIG full-metal jacketed bullet with polygonal rifling. A small triangular portion of skull was found in the unit, as were jewelry tags and a small diamond-cut stone. Pennisi recognized the jewelry tags and the stone as having come from her store.

### Eberhart's Arrest

On the same day in May 2007 that officers executed a search warrant at McCullough's residence in San Francisco, a SWAT team served a search and arrest warrant for Eberhart at the San Francisco address listed on his driver's license. Eberhart was not there. From the San Francisco location, the SWAT team went to an apartment in Vallejo. Two people were in the apartment but Eberhart was not present. One of the occupants was evasive about Eberhart's location but wrote down an address for the detectives when they spoke privately with the occupant. The SWAT team went to that address within the apartment complex. Because they did not have a search warrant for that address, the plan was to secure the site and get a warrant. They knocked and rang the doorbell, but there was no response.

An officer who had a view of the apartment's balcony noticed garbage bags on the balcony. He saw shadows and heard a noise as the bags began to move. A hand slid underneath the garbage bags and removed a black semiautomatic pistol that resembled a Glock. The officer told the person on the balcony to drop the weapon. After a second

10

warning, the officer fired his rifle multiple times.  The officer then saw the gun being thrown from the balcony.  It landed in a nearby field.

Eberhart called Vallejo dispatch and made arrangements to give himself up.  He was placed in handcuffs as he left the apartment.  He was the same person the officer had seen reaching for a gun on the apartment's balcony.

A Glock handgun was located lying in a field near the apartment complex.  The gun used .357 SIG ammunition, the same type of bullet that was found at the Crescent Park crime scene.  A criminalist was unable to determine whether the Glock fired the bullet found at the vacant apartment in Richmond.  However, the criminalist was able to say the bullet was fired by one of a number of Glock models.  No prints were found on the gun.  And, although DNA swabs taken of the Glock gun and magazine showed that a number of contributors touched the magazine and gun, no comparisons with reference samples were made in an effort to identify the contributors.

A search of the Vallejo apartment where Eberhart was apprehended uncovered a number of pairs of Vibram-soled shoes.  None of the shoes recovered by the police matched any of the bloody footprints found at the scene of the crime.

A black aviator-style jacket found in the closet held a green pawn slip.  The pawn slip was from Pacific Loan and Jewelry Company in San Francisco and reflected receipt of a men's ring as collateral for a loan to Eberhart.  The ring was identified by Pennisi as one of the items taken during the April 2007 robbery.

### *The Gang Expert*

Richard Cavagnolo, a correctional officer and assistant institutional gang investigator at San Quentin, testified as a gang expert.  KUMI is a prison-based gang with over 300 validated members at San Quentin.  It began as an effort to recruit African American inmates against the Mexican Mafia.  KUMI's most common symbol depicts a warrior against a background of the continent of Africa.  It is led by Leonard Fulgham, who is in prison in Sacramento.  Fulgham regularly communicates with KUMI members who are not in custody.

The gang's primary activity in prison is recruitment, assaults, and possession of drugs for sale. On the street, its primary activity is generating money through robberies as well as the sale of drugs and guns.

Officer Cavagnolo described the two ranking structures within KUMI, which he identified as the Executive Body Council (EBC) and the Echelon Golden Chain (EGC). Due to the size of the gang, Fulgham communicates only through EBC members, who answer directly to him and disseminate his orders. EBC members are required to pay frequent dues. Each member who participates in criminal activity designed to obtain money receives a cut of the proceeds, although most of it goes to EBC members and a percentage goes to Fulgham.

Documents recovered from Fulgham's cell included a roster showing McCullough and Eberhart as EBC members. Troy Bridges has been mentioned in KUMI written material since 1985 and has admitted his membership. Officer Cavagnolo opined that Weathers was a KUMI gang member at the time of his death. His opinion was based on Peppar's statements identifying him as KUMI, as well as his affiliation with Eberhart and Troy Bridges.

Eberhart has done time at San Quentin. His name comes up frequently with institutional gang investigators. Rosters recovered by prison officials show his status with KUMI. A photo forwarded to Officer Cavagnolo from a county jail shows Eberhart and Fulgham with Charles "Charlie" Jones, a validated KUMI EBC member. All three were in Folsom State Prison between 2003 and 2004. Eberhart had not yet been validated by prison authorities as being a KUMI member at the time of trial because the photo and roster were only found a few weeks before trial.

Officer Cavagnolo opined that the murder of Weathers and the conspiracy to commit robbery were committed for the benefit of, at the direction of, or in association with the KUMI criminal street gang. The murder promoted fear and intimidation, and the robbery obtained money for the gang and Fulgham. He also opined that Eberhart is a KUMI member, even though Eberhart had not been validated as a gang member and did not have certain indicia of membership in KUMI.

12

*Procedural History*

The Contra Costa County District Attorney filed a three-count information charging Eberhart with first degree murder (Pen. Code,[2] § 187), conspiracy to commit robbery and possession of stolen property (§§ 182, 211, 496), and possession of a firearm by a felon (former § 12021, subd. (a)(1)).  As to the murder count, it was alleged that Eberhart personally used a firearm causing great bodily injury and death.  (§ 12022.53.) As to both the murder and conspiracy counts, it was alleged that the offenses were committed for the benefit of the KUMI Nation criminal street gang.  (§ 186.22, subd. (b)(1).)  The district attorney further alleged that Eberhart had suffered a prior strike (§§ 667, subds. (b)–(i), 1170.12), had previously been convicted of a serious felony (§ 667, subd. (a)), and had four prison priors within the meaning of section 667.5, subdivision (b).

A jury found Eberhart guilty as charged, with a finding that the murder was in the first degree.  The court imposed an aggregate sentence of 91-years-to-life in state prison, composed of:  (1) 25 years to life for first degree murder, doubled to 50 years because of the prior strike (§§ 190, subd. (a), 667, subd. (e)(1), 1170.12, subd. (c)(1)); (2) 25 years for the use of a firearm (§ 12022.53, subd. (d)); (3) 5 years for the prior serious felony enhancement (§ 667, subd. (a)(1)); (4) the mid-term of 3 years for conspiracy, doubled to 6 years because of the prior strike (§§ 182, 213, subd. (a)(2)); plus (5) five years for the criminal street gang enhancement associated with the conspiracy count (§ 186.22, subd. (b)(1)(B)).

With respect to the conviction for a felon in possession of a firearm, the court imposed the two-year mid-term but stayed the sentence pursuant to section 654.  The court also imposed the one-year terms for each of the four prison prior allegations (§ 667.5, subd. (b)) but ordered them stricken for purposes of sentencing.  The court imposed but stayed a 10-year sentence for the criminal street gang enhancement associated with the murder count (§ 186.22, subd. (b)(1)(C)), reasoning that the

---

[2]  All further statutory references are to the Penal Code unless otherwise specified.

13

enhancement has the effect of establishing a minimum term before Eberhart may be considered for parole (§ 186.22, subd. (b)(5)).

**DISCUSSION**

## 1. *Legal Sufficiency of Felony-Murder Theory*

Eberhart contends that the trial court's instruction on felony murder was based upon the invalid theory that a person commits a burglary when he enters a building in possession of stolen property. If the possession offense were simply incidental and unrelated to Eberhart's unlawful entry into a vacant apartment, we might be inclined to agree with him. As explained below, that is not the case here.

### A.    Background

Before trial, Eberhart brought a motion to preclude the prosecution from pursuing a conviction for first degree murder under a felony-murder theory. At the time, the prosecution's theory was that Weathers was murdered during the course of a robbery. Eberhart argued that the robbery was complete well before Weathers was killed, pointing out that events of the robbery and homicide were separated by considerable time and distance.

The trial court agreed with Eberhart and concluded that felony murder based upon the commission of a robbery was not "a valid theory" because the "robbery was long dead and over" by the time Weathers was killed. However, the court declined to prohibit voir dire on felony murder, reasoning that the prosecution might be able to come up with a theory that Eberhart was committing a felony other than robbery during the time the robbers were "divvying up the goods."

When the parties were discussing jury instructions, the court refused to give an instruction on felony murder premised upon the murder being committed during the course of a robbery. But the prosecutor came up with a new theory to support felony murder, arguing that the murder was committed during the course of a burglary. The prosecutor described the burglary as "going in [to the apartment] to divide up the stolen property." The court agreed to give an instruction on felony murder based on the prosecution's burglary theory, reasoning that Eberhart entered the apartment "with the

14

intent to commit the possession of the stolen property inside" and only for the purpose of "divid[ing] up the goods . . . ."[3]

The court instructed the jury that Eberhart was being prosecuted for first degree murder under two different theories—that the murder was willful, deliberate, and premeditated, and that the murder was committed during the perpetration of a felony. (See § 189.) To prove that Eberhart was guilty of first degree murder under a felony-murder theory, the court instructed the jury in relevant part that the People had to prove that a perpetrator caused the death of another person while committing a burglary. The court further instructed that "[t]o prove that the defendant committed the crime of burglary, the People must prove that: One, the defendant entered a building; and, two, when he entered the building, he intended to commit the crime of possession of stolen property." The court further instructed the jury on the following elements of the offense of possessing stolen property: "One, the defendant received, concealed or withheld from its owner, . . . property that had been stolen; and two, when the defendant received, concealed or withheld, aided in concealing or withholding the property, he knew that the property had been stolen."

The jury convicted Eberhart of first degree murder. The general verdict does not specify the basis for the jury's decision to find him guilty of first degree murder.

**B.      Discussion**

The first degree felony-murder rule is a creature of statute. (See § 189.) A killing is deemed to be first degree murder as a matter of law when the prosecution proves that the defendant killed while committing one of the felonies enumerated in section 189. (*People v. Young* (2005) 34 Cal.4th 1149, 1175.) Among the felonies listed in section

---

[3] Although Eberhart's counsel complained that it was "a bit of a stretch" to claim that Eberhart entered the apartment with the intent to possess stolen property, he did not formally object to the court's use of the instruction. There was no need to object to preserve the claim for appeal where, as here, Eberhart's substantial rights were affected by the giving of the instruction. (See *People v. Fiore* (2014) 227 Cal.App.4th 1362, 1377–1378; § 1259.)

189 are burglary and robbery. "Under the felony-murder rule, a strict causal or temporal relationship between the felony and the murder is not required; what is required is proof beyond a reasonable doubt that the felony and murder were part of one continuous transaction. [Citation]. This transaction may include a defendant's flight after the felony to a place of temporary safety." (*People v. Young, supra,* at p. 1175.) The purpose of the felony-murder rule is ostensibly to deter those engaged in inherently dangerous felonies " 'from killing negligently or accidentally.' " (*People v. Bryant* (2013) 56 Cal.4th 959, 965.)

Burglary is defined, in pertinent part, as entry into a dwelling or other defined structure or vehicle with the intent to commit larceny or any felony. (§ 459.) The crime is complete upon entry with the requisite intent regardless of whether the intended felony is actually committed. (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1377.) In this case, it was alleged that Eberhart intended to commit the felony of possessing stolen property at the time he entered the vacant apartment. (§ 496.)

Eberhart's basic claim is that he could not have entered with intent to commit the possession of stolen property because he already possessed the stolen property *before* he entered the apartment. He argues that entry must precede the commission of the intended felony in order for a burglary to occur. (See *People v. Salemme* (1992) 2 Cal.App.4th 775, 784 ["[T]he intended crime cannot be committed without first committing burglary].)" Eberhart poses hypothetical situations in which a person enters a structure in possession of prohibited items, such as drugs, and questions whether that constitutes a burglary based simply upon the person's felony possession of prohibited items.

We agree with Eberhart that a person does not commit a burglary offense simply because he or she enters a structure in possession of prohibited items. In that case, the person is not entering the structure with the intent to commit a felony possession offense, even if that offense may be considered an ongoing crime. The person may intend to *remain* in possession of prohibited items but the possessory offense is already complete at the time of entry.

16

We are not aware of any California case law that addresses the issue raised by Eberhart. A similar issue was discussed by the Kansas Supreme Court in *State v. Bowen* (1997) 262 Kan. 705. There, the defendant was charged with aggravated burglary based in part upon an contention that he entered a dwelling with the intent to possess methamphetamine that he already possessed at the time of entry. (*Id.* at p. 707.) The defendant's methamphetamine possession was "wholly incidental" to the entry and played no role in his decision to enter by force. (*Id.* at p. 708.) The court rejected the state's claim that a burglary offense could be premised upon the defendant's continuing possession of the drugs. According to the court, there is no authority for the proposition that a burglary offense can be premised upon the "mere happenstance of methamphetamine being on [defendant's] person with no showing or inference that its possession was in any manner related to defendant's unlawful entry into the residence . . . ." (*Ibid.*) The defendant did not enter the dwelling "with the purpose of possessing the drugs therein." (*Id.* at p. 709.)

In this case, the possession of stolen property was not merely incidental to Eberhart's entry into the vacant apartment. The purpose for going there was to divide up the stolen property among the robbery participants. Thus, the intent upon entry was to facilitate the concealment of the stolen property from its rightful owner. A person commits the offense of possession of stolen property if that person "conceals" or "aids in concealing" property that is known to be stolen. (§ 496.)

As Eberhart concedes in his opening brief, receiving stolen property and concealing stolen property are separate offenses. (*People v. Grant* (2003) 113 Cal.App.4th 579, 594.) "The crime of receiving stolen property is complete when the defendant takes possession of the property with knowledge it is stolen." (*Ibid.*) By contrast, the crime of concealing stolen property is a continuing offense that consists of "intentionally secreting stolen property in violation of the affirmative duty to return it or at least to disclose its whereabouts ─ to its rightful owner." (*Williams v. Superior Court* (1978) 81 Cal.App.3d 330, 343–344.) Even if we were to conclude that the offense of

receiving stolen property was complete at the time Eberhart entered the apartment,[4] we would still conclude that there was evidence to support a theory that the robbers entered the apartment to further efforts to conceal the stolen property.

Our conclusion would be different if Eberhart had simply entered the apartment in possession of stolen property with no intent to divide up or conceal the property. Even though concealing stolen property is a continuing possessory offense, we do not suggest that the incidental possession of stolen property upon entry into a building, without more, is sufficient to constitute a burglary. In such a case, Eberhart would not have entered with the specific intent or purpose of possessing stolen property. Here, by contrast, the evidence supports an inference that Eberhart entered the vacant apartment with the intent to facilitate the distribution and concealment of the stolen property. These facts are sufficient to establish a burglary offense premised upon an intent to possess stolen property at the time of entry into the apartment.

Accordingly, the court did not err in instructing the jury on a felony-murder theory under the circumstances presented here.

**2.       *Sufficiency of the Evidence to Support First Degree Murder Conviction***

Eberhart contends the evidence is insufficient to uphold the first degree murder conviction on either a premeditation or a felony-murder theory. We disagree.

---

[4] The People argue that Eberhart did not possess any particular item of stolen property until after he entered the apartment for the purpose of "the pooling and allocation ritual." In essence, the People contend the crime of receiving stolen property was not complete until the robbers divided up the loot. Eberhart does not directly address this contention but seems to argue the crime was complete before entry into the apartment because the robbers were jointly in possession of the stolen property prior to its division. Presumably, Eberhart is relying on the principle that possession of stolen property may be actual or constructive and need not be exclusive as long as the defendant exercises some measure of control or dominion over the property. (*People v. Grant* (2003) 113 Cal.App.4th 579, 596.) Because we conclude that Eberhart entered the apartment for the purpose of furthering the *concealment* of the stolen property, it is unnecessary for us to decide whether the crime of *receiving* stolen property was complete before Eberhart entered the apartment.

18

When the sufficiency of the evidence to support a first degree murder judgment on a premeditation theory is challenged, we consider "the evidence presented and all logical inferences from that evidence . . . in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—from which a reasonable trier of fact could find that the defendant premeditated and deliberated beyond a reasonable doubt. [Citations.] The standard is the same in cases . . . where the People rely primarily on circumstantial evidence." (*People v. Perez* (1992) 2 Cal.4th 1117, 1124.) The standard is much the same when the question on appeal is whether substantial evidence supports a first degree murder verdict on a felony-murder theory. The question is whether any reasonable trier of fact could have been persuaded beyond a reasonable doubt that the murder was committed during the commission of the identified felony, which in this case was burglary. (Cf. *People v. Marks* (2003) 31 Cal.4th 197, 230.)

"Before a trial court's judgment may be set aside for insufficiency of evidence to support the verdict, it must clearly appear that on no hypothesis whatever is there sufficient evidence to support it." (*People v. Russell* (2010) 187 Cal.App.4th 981, 992.)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26 (*Anderson*), the Supreme Court surveyed a number of prior cases involving the sufficiency of the evidence to support findings of premeditation and deliberation. The court identified three categories of evidence pertinent to the determination of premeditation and deliberation: (1) planning activity, (2) motive, and (3) manner of killing. (*Id.* at p. 27.) Regarding these categories, the *Anderson* court stated: "Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*Ibid.*) In *People v. Perez, supra,* 2 Cal.4th at page 1125, the Supreme Court clarified that "[t]he *Anderson* factors, while helpful for purposes of review, are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." "In identifying categories of evidence bearing on premeditation and deliberation, *Anderson* did not purport to establish an exhaustive list that would

19

exclude all other types and combinations of evidence that could support a finding of premeditation and deliberation." (*Ibid.*)

Eberhart claims the *Anderson* factors do not support the first degree murder verdict. First, he contends there was no evidence of planning activity and highlights the fact that the prosecutor admitted in closing argument that the premeditation theory was a "tough sell" because "there's no obvious planning" and "no evidence that [Eberhart] set out to kill Randy Weathers, and it happened in a short amount of time."[5] Second, he argues that the manner of the killing did not demonstrate that it was done according to a preconceived design. We are not persuaded.

There was evidence supporting all three of the *Anderson* factors in this case. First, with regard to planning activity, the evidence established that Eberhart was a leader in the KUMI gang who brought a gun not only to the robbery, but also to the apartment where the robbers intended to divide the spoils. He immediately pulled out his gun when another participant in the robbery drew his own gun after accusing Weathers of concealing robbery proceeds. These facts support an inference that Eberhart prepared for precisely the kind of trouble that occurred. His actions were not the result of a rash and unconsidered impulse but instead reflected that he made a cold and calculated judgment to kill Weathers in order to preserve his reputation and standing in the gang. (See *People v. Mendoza* (2011) 52 Cal.4th 1056, 1070 [planning activity shown where defendant in traffic stop quickly devised plan to kill officer who indicated intent to conduct weapons search]; *People v. Perez, supra,* 2 Cal.4th at p. 1127 [test of premeditation is not duration but extent of reflection].)

There is no debate about Eberhart's motive. McCullough reported that Eberhart killed Weathers to avoid appearing soft or losing credibility with gang members under his

---

[5] We disagree with Eberhart's suggestion that the prosecutor somehow discounted the strength of the evidence supporting a premeditation and deliberation theory. Rather, the prosecutor simply acknowledged that lay jurors may have difficulty with the legal concept of deliberation, which turns on the extent of reflection, not the duration of the deliberative process. (See *People v. Perez, supra*, 2 Cal.4th at p. 1127.)

command.  Eberhart does not suggest that there is a lack of evidence concerning his motive.

As for the manner of killing, a single shot to the head at close range may be considered sufficiently particular and exacting to permit an inference that defendant was acting according to a preconceived plan.  (*People v. Mendoza, supra,* 52 Cal.4th at p. 1071.)  In this case, Eberhart pulled out his gun to establish control over the situation.  After Weathers tried to explain away his actions and seek Eberhart's forgiveness, Eberhart coldly responded, "Not in this lifetime," before shooting Weathers at close range in the temple.  The manner of killing was a cold and exacting method of execution in front of multiple witnesses to whom Eberhart intended to make a point.  Because the manner of killing reflected precision and purpose, a rational jury could find that Eberhart had a preconceived design to kill Weathers.  (See *People v. Halvorsen* (2007) 42 Cal.4th 379, 422 [victims shot in head or neck from within a few feet]; *People v. Marks, supra,* 31 Cal.4th at p. 232 [noting calm, cool and focused manner in which shootings were carried out].)

Even if the evidence of planning activity is discounted, there is still strong evidence of motive and a preconceived design to kill Weathers.  (See *Anderson, supra,* 70 Cal.2d at p. 27 [evidence support manner of killing and motive categories enough to support finding of premeditation and deliberation].)  We conclude the evidence of premeditation and deliberation was sufficient to support the first degree murder verdict.

When a count is submitted to the jury on alternative theories, and the evidence is insufficient as to one theory, we assume the jury rested its verdict on the theory adequately supported by the evidence absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground.  (*People v. Guiton* (1993) 4 Cal.4th 1116, 1127–1130; accord, *People v. Silva* (2001) 25 Cal.4th 345, 370.)  Here, the prosecutor submitted the first degree murder count to the jury on both a felony-murder theory and a premeditation and deliberation theory.  As Eberhart appears to concede, the record does not give any indication that the jury rested its verdict on one theory or the other.  Accordingly, in light of our conclusion that the record contains ample evidence to

21

sustain the verdict of first degree murder on a premeditation and deliberation theory, it is unnecessary to address whether sufficient evidence supports the verdict on a felony-murder theory.

**3.    *Denial of Motion to Suppress Identification Evidence***

Eberhart contends that a photo lineup shown to jewelry store owner Iana Pennisi was impermissibly suggestive and tainted her in-court identification of Eberhart.  He further asserts that the admission of her identification testimony violated his due process rights.  As explained below, because we conclude the photo lineup was not unnecessarily suggestive, the identification testimony was properly presented to the jury.  In any event, any error in allowing the jury to hear the testimony was harmless beyond a reasonable doubt in light of other evidence implicating Eberhart in the robbery.

**A.    Governing Legal Principles**

" 'In deciding whether an extrajudicial identification is so unreliable as to violate a defendant's right to due process, the court must ascertain (1) "whether the identification procedure was unduly suggestive and unnecessary," and, if so, (2) whether the identification was nevertheless reliable under the totality of the circumstances.' " (*People v. Carpenter* (1997) 15 Cal.4th 312, 366–367, abrogated on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1185, 1193.)

In evaluating whether a photographic lineup is unduly suggestive, "[t]he question is whether anything caused defendant to 'stand out' from the others in a way that would suggest the witness should select him." (*People v. Carpenter, supra,* 15 Cal.4th at p. 367.)  If the court determines that a lineup is not impermissibly suggestive, the due process inquiry ends and the court need not consider whether the identification was nonetheless reliable.  (*People v. Carter* (2005) 36 Cal.4th 1114, 1164.)  In determining whether an unduly suggestive identification procedure was nonetheless reliable, the reviewing court looks at factors such as "the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty

demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.)

"The defendant bears the burden of demonstrating the existence of an unreliable identification procedure." (*People v. Cunningham, supra,* 25 Cal.4th at p. 989.) We apply independent review to a trial court's ruling that a pretrial identification procedure was not unduly suggestive. (*People v. Kennedy* (2005) 36 Cal.4th 595, 609, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.)

### B.     Factual Background

Before trial, Eberhart moved to suppress Pennisi's identification testimony. At the suppression hearing, the officer who first responded to the robbery reported that Pennisi was essentially unable to describe suspect number three in the robbery, who was later identified as Eberhart. The police report reflected only that suspect number three was an "UNKNOWN BMA [black male adult], with dark scarf over face, no further information." By contrast, Pennisi gave more detailed descriptions of the other suspects.

At around 1:00 a.m. on April 23, 2007, approximately a day and a half after the robbery, Daly City and Richmond police officers went to Pennisi's residence to show photo lineups to her. She had been asleep and was groggy. Pennisi was standing in a dimly lit hallway as she was shown the photo lineups. She failed to identify anyone. Eberhart was pictured in one of the photo lineups containing five other individuals, all of whom were African-American. All but one of the pictured individuals appeared to have braided hair.

Sergeant Esteban Barragan, a Richmond police detective who was present when the first lineup was shown to Pennisi, was concerned that she had not been shown a photo of Eberhart that reflected his current appearance. He learned that Joanna Peppars described Eberhart as having a cornrow hairstyle. He found a more recent photo of Eberhart in which he had a cornrow hairstyle. He had not received any information from Pennisi about suspect number three's description other than what was described in the police report. Sergeant Barragan assembled a photo array of six individuals, including the more recent photo of Eberhart. He sought to find individuals with the same race,

height, weight, and hairstyle as Eberhart.  He had difficulty finding persons matching Eberhart's physical description with a cornrow hairstyle.  Of the six individuals depicted in the photo array assembled by Sergeant Barragan, Eberhart and one other individual had their hair arranged in cornrows.

On April 25, 2007, two days after Pennisi had been shown the first photo lineup containing Eberhart, Sergeant Barragan arrived at her jewelry store to show her the photo lineups he had assembled.  Pennisi circled Eberhart's picture and wrote, "He resembled the shorter man and someone I've seen in the store before."  She claimed at the time she was only "50 percent sure" of the identification because she had seen only half his face during the robbery.  She put her hand across the bottom of Eberhart's face as if it were covered by a bandanna so that should could focus on the top of the face.  She claimed she recognized the eyes the most and associated them with someone who had been in her store before.

During the course of the suppression hearing, Pennisi was asked to look at Eberhart and say whether he was one of the persons who robbed her store.  She identified Eberhart based upon his eyes and stated, "I recognize the eyes that looked at me when suspect number three was leaving.  That's what I'm sure about."  When asked whether she was now certain that Eberhart was one of the robbers, she responded, "I personally would make a judgment on the eyes.  For me as a person, the eyes are pretty distinctive . . . .  The rest I'm not sure of."

Pennisi offered a description of suspect number three during the suppression hearing.  She recalled that he was African-American, appeared to be in his 20's, was about her height, and was stocky or muscular.  She also recalled that he had braided hair that lay flat on his head and flowed back.  He was wearing a bandanna during the robbery that covered his face below the tip of his nose and the middle of his cheeks.  There is no indication that Pennisi conveyed any facts to police about Eberhart's age, height, build, or hairstyle before she was shown the two photo lineups containing Eberhart.

Pennisi claimed that she could remember almost nothing about the robbers in the immediate aftermath of the robbery but that details came back to her within about a week

24

of the robbery. She thought she had seen suspect number three about a month before the robbery trying to sell gold teeth to her. At the time, he became aggressive when they were discussing the price and stared at her with "that real, real cold look in his eyes like he would jump over me."

After hearing argument and viewing the two photo lineups, the court concluded the second lineup was not unduly suggestive. The court found Pennisi's testimony "very credible" and did not believe that Eberhart's photo stood out. The court noted that all the subjects in the second photo array were African-American males of the same age, build, and facial structure. The court observed that they had different hairstyles, with two appearing to have cornrows and two with short hair. The court observed that the other individuals in the second lineup were more similar to Eberhart than those in the first lineup in terms of the shape of the face and skin tone.

**C.      Analysis**

Eberhart claims the second photo lineup was impermissibly suggestive for two reasons. First, he argues that Pennisi was shown two lineups in quick succession in which Eberhart was the only individual pictured in both lineups. Second, he claims the second lineup made him stand out because he was the only one with cornrows going back into braids.

We are not convinced that the use of successive lineups was unduly suggestive under the circumstances presented here. Eberhart relies on the principle that using "a suspect's image in successive lineups might be suggestive if the same photograph were reused or if the lineups followed each other quickly enough for the witness to retain a distinct memory of the prior lineup." (*People v. Yeoman* (2003) 31 Cal.4th 93, 124.) In this case, the two lineups contained different photos of Eberhart, with the second lineup containing a more recent picture. In one photo, his head is upright and in the other his head is tilted down slightly. His facial hair is different in the two photos and his complexion appears darker in the second lineup. In addition, his hair is different in the two photos because it is clear that he has cornrows in the second lineup. In short, the two photos are distinct in several respects. Indeed, that is why Sergeant Barragan sought to

create a lineup that included a more representative depiction of Eberhart's current appearance. Further, there is no reason to believe Pennisi would have had a distinctive memory of Eberhart's photo, even though she was shown the first lineup about two days before the second lineup. She saw the first lineup in dim light in the hallway of her home at 1:00 a.m. after being woken up by police officers. In addition, she was shown a number of lineups on that occasion and was not limited to a photo array that included Eberhart.

We are also not convinced that Eberhart stood out from the others in the second photo lineup simply because he had cornrows. The second photo lineup contains a variety of hairstyles. Eberhart's hair does not stand out as somehow different from an otherwise uniform hair style worn by the other individuals. All six of the photos depict young to middle-aged African American men similar to Eberhart in height, build, facial structure, and complexion. Nevertheless, Eberhart claims that his hair was the only distinctive thing Pennisi identified about his appearance that could be represented in a photo lineup. But Pennisi did not refer to Eberhart's hairstyle until after the photo lineups were shown to her. There is no reason to believe that Eberhart's hairstyle was the one distinguishing thing that stood out to her. Otherwise, she probably would have recalled that fact from the outset. Further, Pennisi did not focus on Eberhart's hairstyle as a basis for identifying him in the lineup. In fact, she did not even mention it as a basis for her choice. Instead, she focused on the eyes and associated them with both suspect number three and a person who had visited her store about a month before the robbery. The court found Pennisi particularly credible in describing how she recognized Eberhart's eyes.

We agree with the trial court that the second photo lineup was not unduly suggestive. Accordingly, it is unnecessary to consider whether the identifications were nevertheless reliable.

Even if we were to conclude that the court erred in allowing testimony about Pennisi's eyewitness identification of Eberhart, any error was harmless beyond a reasonable doubt. (See *People v. St. Germain* (1982) 138 Cal.App.3d 507, 519

26

[identifying applicable standard of harmless error].) There was ample evidence completely unrelated to Pennisi's identification of Eberhart that connected him to the robbery and murder. Joanna Peppars testified about Eberhart's involvement in the robbery planning after other gang members dropped out. The last time she saw Weathers alive was when he was picked up in a car in which Eberhart was a passenger. Weathers was being picked up to take part in the robbery, which occurred just hours later. Eberhart also pawned a ring stolen in the robbery. His voice was recorded in incriminating conversations with Peppars following the robbery in which he plainly implicated himself in the commission of the robbery. Further, McCullough placed Eberhart at the scene of the robbery and murder. Although Eberhart complains that McCullough was a deceitful witness, his testimony was far from the only evidence that linked Eberhart to the robbery and murder. Consequently, there is no reason to believe the outcome would have been any different if the eyewitness identification evidence had been excluded.

### 4. *Gang Expert's Purported Reliance on Testimonial Hearsay*

On appeal and in a related petition for a writ of habeas corpus, Eberhart contends the testimony of the prosecution's gang expert, Richard Cavagnolo, was largely based on testimonial hearsay and consequently violated his Sixth Amendment right to confront witnesses as recognized in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). In particular, he claims that three categories of testimony offered by Officer Cavagnolo constituted testimonial hearsay: (1) testimony that certain predicate offenses were committed by members of KUMI; (2) testimony regarding the crimes that comprise the primary activities of KUMI; and (3) testimony that Eberhart was a KUMI member. We reject Eberhart's claim of error for the reasons that follow.[6]

The Sixth Amendment to the federal Constitution guarantees a defendant's right to confront adverse witnesses. (U.S. Const., 6th Amend.; see also *People v. Lopez* (2012)

---

[6] Because Eberhart's claim lacks merit, we need not consider whether he properly preserved his claim by objecting on hearsay or confrontation clause grounds in the trial court. In addition, it is unnecessary to consider his alternative argument that his counsel was ineffective in failing to object.

55 Cal.4th 569, 576.) In *Crawford*, the United States Supreme Court held that the prosecution may not rely on testimonial hearsay unless the declarant is unavailable to testify, and the defendant had a prior opportunity for cross-examination. (*Crawford, supra,* 541 U.S. at p. 59, fn. 9.) " 'Hearsay evidence' is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200, subd. (a).) A statement that is not offered to prove the truth of the matter asserted does not constitute hearsay, and its use is not barred by the confrontation clause. (*Crawford, supra,* at p. 59, fn. 9 ["The Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted . . . ."].)

"California law permits a person with 'special knowledge, skill, experience, training, or education' in a particular field to qualify as an expert witness [citation] and to give testimony in the form of an opinion [citation]. Under Evidence Code section 801, expert opinion testimony is admissible only if the subject matter of the testimony is 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' [Citation.] The subject matter of the culture and habits of criminal street gangs, of particular relevance here, meets this criterion. [Citations.] [¶] Evidence Code section 801 limits expert opinion testimony to an opinion that is '[b]ased on matter . . . perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates . . . .' " (*People v. Gardeley* (1996) 14 Cal.4th 605, 617 (*Gardeley*).)

It has long been the law in California that experts may base their opinions " 'on reliable hearsay, including out-of-court declarations of other persons.' " (*Gardeley, supra,* 14 Cal.4th at p. 618; see Evid.Code, § 801, subd. (b).) "And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter . . . upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion." (*Gardeley, supra,* at p. 618.)

In *Gardeley*, our Supreme Court concluded that a gang expert properly relied on and revealed to the jury the contents of otherwise inadmissible hearsay in testifying on direct examination that a hypothetical assault by three gang members was gang-related. (*Gardeley, supra,* 14 Cal.4th at pp. 611–613, 618–619.) The court reasoned that it was proper for the expert to relate the contents of the out-of-court statement to the jury because it was not offered for its truth but for the nonhearsay purpose of explaining the basis of the expert's opinion. (*Id.* at pp. 618–619.)

*Gardeley* was decided eight years before *Crawford*, and thus, does not address whether *Crawford* applies to out-of-court statements that are used as the basis for an expert's opinion. In *People v. Thomas* (2005) 130 Cal.App.4th 1202 (*Thomas*), Division Two of the Fourth Appellate District considered the issue and found no *Crawford* violation. (*Thomas, supra,* at pp. 1209–1210.) Relying on *Gardeley* and *Crawford's* admonition that the confrontation clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted, the court concluded that a gang expert, in opining that the defendant was a gang member, properly relied on and testified to the contents of hearsay statements by other gang members that the defendant was a gang member. (*Thomas, supra,* at pp. 1206, 1208–1210.) The court reasoned, "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion." (*Id.* at p. 1210; see *People v. Cooper* (2007) 148 Cal.App.4th 731, 747 ["*Crawford* was concerned with the substantive use of hearsay evidence. . . . It did not suggest that the confrontation clause was implicated by admission of hearsay for nonhearsay purposes"]; *People v. Ramirez* (2007) 153 Cal.App.4th 1422, 1427 ["Hearsay in support of expert opinion is simply not the sort of testimonial hearsay the use of which *Crawford* condemned"]; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 153–154 [same].)

In *People v. Hill* (2011) 191 Cal.App.4th 1104, 1129–1130, Division Five of this court questioned the reasoning in *Thomas,* noting that *Gardeley* and *Thomas* were based on the "implied assumption that the out-of-court statements may help the jury evaluate the expert's opinion without regard to the truth of the statements. . . . But this assumption appears to be incorrect." The court observed that "where basis evidence consists of an out-of-court statement, the jury will often be required to determine or assume the truth of the statement in order to utilize it to evaluate the expert's opinion." (*Hill, supra,* at p. 1131, fn. omitted.) Nevertheless, the court concluded that it was bound by *Gardeley* and similar precedent supporting *Thomas*: "But for the long line of California Supreme Court precedent supporting *Thomas*, we would reject that opinion. . . . But our position in the judicial hierarchy precludes that option; we must follow *Gardeley* and the other California Supreme Court cases in the same line of authority." (*Hill, supra,* at p. 1131, fn. omitted.) Thus, the court concluded that the admission of several out-of-court statements as expert opinion basis evidence, including a testimonial statement, violated neither the hearsay rule nor the confrontation clause because they were not offered for their truth but only to evaluate the expert's opinions. (*Ibid.*)

We remain bound by *Gardeley*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Because the challenged evidence was admitted for the limited purpose of explaining the basis of Officer Cavagnolo's opinions, its admission did not run afoul of the Sixth Amendment right to confrontation.

**5.      *Failure to Prove Strike and Prior Conviction Allegations***

Eberhart contends that enhancements for a prior strike, a prior felony conviction, and prior prison terms were neither admitted nor proved at trial. He points out that, for purposes of the charge of being a felon in possession of a firearm, he admitted prior felony convictions for drug possession and unlawful firearm possession under *People v. Valentine* (1986) 42 Cal.3d 170, 173, in order to "sanitize" the charges and avoid being required to disclose the nature of the prior convictions to the jury. Eberhart contends he did not stipulate to the convictions for any purpose other than sanitization. He further

argues that, although he waived a jury trial on the priors, he never stipulated to a robbery prior as a strike, as a serious felony prior, or as a prison prior.

The People concede that there is no record of a stipulation, trial, or finding on Eberhart's strike, serious felony, and prison prior allegations. We agree with Eberhart that there is no evidentiary support for the imposition of prior conviction enhancements. Consequently, the aspects of his sentence premised on the prior conviction allegations must be reversed, including the doubling of his 25-year murder sentence and his 3-year conspiracy sentence based upon the commission of a prior strike (§ 667, subd. (e)(1), 1170.12, subd. (c)(1)) plus the 5-year term for the prior serious felony enhancement (§ 667, subd. (a)(1)). As for the prior prison enhancements (§ 667.5, subd. (b)), they were imposed but ordered stricken for purposes of sentencing. Even though the prison priors do not increase Eberhart's sentence, they should nevertheless be reversed in view of the lack of evidentiary support for their imposition.

Because state and federal double jeopardy protections do not bar retrial of a prior conviction allegation (*People v. Monge* (1997) 16 Cal.4th 826, 845), the matter is remanded for retrial of the prior conviction enhancements.

## 6.     *Error in Abstract of Judgment*

Eberhart was convicted of criminal street gang enhancements in connection with his convictions for first degree murder and conspiracy to commit robbery. For the enhancement associated with the murder charge, the trial court recognized that the consequence of the enhancement is to require a minimum period before Eberhart would be eligible for parole. (§ 186.22, subd. (b)(5).) For the enhancement associated with the conspiracy charge, the court imposed a five-year term. (§ 186.22, subd. (b)(1)(B).) As Eberhart points out, the abstract of judgment incorrectly reflects the imposition of *two* enhancements of five years each for street gang enhancements. The five-year street gang enhancement associated with the murder charge should be stricken. Instead, the abstract should reflect a minimum period of 15 years before Eberhart may be considered for parole in connection with the murder conviction. (§ 186.22, subd. (b)(5); see *People v.*

*Lopez, supra,* 34 Cal.4th at p. 1004; *People v. Williams* (2014) 227 Cal.App.4th 733, 745.)

## DISPOSITION

The trial court is directed to modify the abstract of judgment to delete the 5-year gang enhancement (§ 186.22, subd. (b)(1)(B)) associated with count one and to replace it with the 15-year minimum term for parole eligibility required by section 186.22, subdivision (b)(5). The sentence enhancements for a prior strike associated with counts one and two (§ 667, subd. (e)(1), 1170.12, subd. (c)(1)), a prior serious felony (§ 667, subd. (a)(1)), and prison priors (§ 667.5, subd. (b)) are reversed. The matter is remanded for a retrial of the prior conviction allegations and for resentencing.

The judgment is affirmed as modified. The petition for a writ of habeas corpus is denied.

_____
McGuiness, P. J.


We concur:


_____
Siggins, J.


_____
Jenkins, J.